# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF NEW YORK

SECURITIES AND EXCHANGE COMMISSION,

              PLAINTIFF,

      v.

STRAIGHTPATH VENTURE PARTNERS LLC,
STRAIGHTPATH MANAGEMENT LLC,
BRIAN K. MARTINSEN,
FRANCINE A. LANAIA,
MICHAEL A. CASTILLERO, AND
ERIC D. LACHOW,

              DEFENDANTS.

**22 Civ. 03897 (LAK)**

---

**The StraightPath Defendants' Memorandum of Law in Opposition
to the SEC's "Emergency" Application For Extraordinary Injunctive Relief**

CAHILL GORDON & REINDEL LLP
    Brian Markley
    Samson Enzer
    32 Old Slip
    New York, New York 10005
    Telephone:  (212) 701-3230 / -3125
    Facsimile:  (212) 259-5420

NELSON MULLINS RILEY & SCARBOROUGH LLP
    Scott N. Sherman
    Josh Lewin
    201 17th Street NW
    Atlanta, GA 30363
    Telephone:  (404) 322-6231
    Facsimile:  (404) 322-6338

*Attorneys for Defendants StraightPath Venture Partners LLC, StraightPath Management LLC, Brian K. Martinsen, Francine A. Lanaia, Michael A. Castillero and Eric D. Lachow*

## TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ................................................................................................1

BACKGROUND ......................................................................................................................6

    A.    The SEC Fails to Disclose that StraightPath Distributed Hundreds of
          Millions of Dollars in Returns to Investors............................................................6

    B.    The SEC Fails to Disclose Details About StraightPath's Cooperation
          Efforts .....................................................................................................................8

    C.    The StraightPath Defendants' Proposed Relief to Protect Investors
          Pending the Outcome of this Litigation ................................................................16

ARGUMENT ..........................................................................................................................17

I.    The SEC Fails to Satisfy its Burden to Freeze Personal Assets ....................................... 17

    A.    The SEC Fails to Show Investor Losses to Justify Freezing Personal
          Assets ....................................................................................................................18

    B.    The SEC Fails to Present Credible Evidence that the Defendants will
          Dissipate Assets in the Future to Justify Freezing Personal Assets....................22

    C.    The SEC's Attempt to Freeze Personal Assets Raises Constitutional
          Concerns ................................................................................................................24

    D.    Any Personal Asset Freeze Should Carve-Out Living Expenses and
          Counsel Fees .........................................................................................................25

II.    The SEC Fails to Meet its Burden to Show that an Emergency Receiver is Needed ....... 26

III.    The SEC Fails to Meet Its Burden To Justify a Verified Accounting ............................... 28

IV.    The SEC Fails to Show a Substantial Likelihood of Success on the Merits..................... 29

V.    The Court Should Not Draw Any Adverse Inference From the Individual
    Defendants' Invocation of their Constitutional Rights .................................................... 31

CONCLUSION.......................................................................................................................34

# TABLE OF AUTHORITIES

*American Infertility of New York, P.C.* v. *CNY Fertility, PLLC*,
    2021 WL 4803539 (S.D.N.Y. Oct. 13, 2021) ..........................................................21n

*Brock* v. *Tolkow*,
    109 F.R.D. 116 (E.D.N.Y. 1985) ......................................................................34

*Cellular S. Inc.* v. *Merrill, Lynch, Pierce, Fenner & Smith, Inc.*,
    516 F. App'x 30 (2d Cir. 2013) ........................................................................29

*CFTC* v. *Walsh*,
    2010 WL 882875 (S.D.N.Y. Mar. 9, 2010) ......................................................24

*Connecticut Bar Ass'n* v. *United States*,
    620 F.3d 81 (2d Cir. 2010) ............................................................................21n

*FTC* v. *Campbell Capital LLC*,
    2018 WL 5781458 (W.D.N.Y. Oct. 24, 2018) ..................................................22

*Liu* v. *SEC*,
    591 U.S. __, 140 S. Ct. 1936 (2020) ...................................................... *passim*

*Lorusso* v. *Borer*,
    260 F. App'x 355 (2d Cir. 2008) .....................................................................33

*Luis* v. *United States*,
    578 U.S. 5, 136 S. Ct. 1083 (2016) .................................................................24

*New York* v. *Nat'l Highway Traffic Safety Admin.*,
    974 F.3d 87 (2d Cir. 2020) ............................................................................19n

*Ohio* v. *Reiner*,
    532 U.S. 17, 121 S. Ct. 1252 (2001) ...............................................................32

*SEC* v. *Bivona*,
    No. 16 Civ. 1386, 2016 WL 7645022 (N.D. Cal. Mar. 22, 2016) .........................27

*SEC* v. *Bremont*,
    954 F. Supp. 726 (S.D.N.Y. 1997) (Kaplan, J.) .................................................25

*SEC* v. *Caramadre*,
    717 F. Supp. 2d 217 (D.R.I. 2010) ..................................................................33

*SEC* v. *Coates*,
    1994 WL 455558 (S.D.N.Y. Aug. 23, 1994) ....................................................24

*SEC* v. *FTC Capital Markets, Inc.*,
    2010 WL 2652405 (S.D.N.Y. June 30, 2010) (Gardephe, J.)................................26

*SEC* v. *GPB Capital Holdings, LLC et al.*,
    No. 21 Civ. 00583 (MKB), (E.D.N.Y. Apr. 14, 2021) ..........................................27

*SEC* v. *Infinity Grp. Co.*,
    212 F.3d 180 (3d Cir. 2000)..................................................................................22

*SEC* v. *Lybrand*,
    2000 WL 913894 (S.D.N.Y. July 6, 2000) ............................................................28

*SEC* v. *Manor Nursing Centers, Inc.*,
    458 F.2d 1082 (2d Cir. 1972)................................................................18, 22, 27

*SEC* v. *Morgan*,
    2019 WL 2385395 (W.D.N.Y. June 5, 2019) .................................................. *passim*

*SEC* v. *Oxford Capital Sec., Inc.*,
    794 F. Supp. 104 (S.D.N.Y. 1992).......................................................................29

*SEC* v. *Ryan*,
    747 F. Supp. 2d 355 (N.D.N.Y. 2010) ...............................................................27n

*SEC* v. *Santillo*,
    2018 WL 3392881 (S.D.N.Y. July 11, 2018) ......................................................22

*SEC* v. *Stein*,
    2009 WL 1181061 (S.D.N.Y. April 30, 2009) (Lynch, J.)...................................26

*SEC* v. *Universal Express, Inc.*,
    2007 WL 2469452 (S.D.N.Y. Aug. 31, 2007) (Lynch, J.) ..................................26

*Stokeling* v. *United States*,
    586 U.S. __, 139 S. Ct. 544 (2019) ...................................................................19n

*United States* v. *Beckman*,
    2012 WL 1366064 (D. Minn. Apr. 19, 2012) ....................................................27n

*United States* v. *Monsanto*,
    924 F.2d 1186 (1991)...........................................................................................24

*United States* v. *Scrushy*,
    366 F. Supp. 2d 1134 (N.D. Ala. 2005) ..............................................................16

*Woods* v. *START Treatment & Recovery Ctrs., Inc.*,
    864 F.3d 158 (2d Cir. 2017)................................................................................33

**Rules**

Federal Rule of Evidence 408................................................................ *passim*

**Statutes**

15 U.S.C. §78u.............................................................................19, 19n

18 U.S.C.
§6003.............................................................................................33

Pursuant to the Court's Order of May 13, 2022 (Dkt. 16), defendants StraightPath Venture Partners LLC and StraightPath Management LLC (collectively, "StraightPath"), along with Brian K. Martinsen, Francine A. Lanaia, Michael A. Castillero and Eric D. Lachow (together with StraightPath, the "Defendants") respectfully submit this memorandum of law in opposition to the "emergency" application filed by plaintiff Securities and Exchange Commission (the "SEC") seeking a preliminary injunction freezing corporate and personal assets, the appointment of a receiver, and other extraordinary relief.

## PRELIMINARY STATEMENT

The SEC's "emergency" application is replete with inflammatory rhetoric and unfounded allegations that appear to be aimed more at smearing StraightPath as a purported "fraud" in the court of public opinion than at addressing the narrow question before this Court. The SEC's claims are meritless. The flimsy nature of the SEC's accusations will be exposed once StraightPath is afforded a full and fair opportunity to test the SEC's flawed theories through discovery, pretrial motion practice, and trial. But that is not the central issue before the Court at this early stage of the proceedings. Rather, the singular, dispositive question raised by the SEC's application is whether (and if so, what) safeguards need to be ordered by the Court to ensure that StraightPath investors' interests are protected pending the outcome of this litigation.

There is no actual emergency justifying the draconian pretrial restraints the SEC seeks, in part because StraightPath has been cooperating with the SEC's inquiry for years and voluntarily undertook a standstill of the company's business in February 2022 to address the SEC's alleged concerns (regardless of their lack of merit). The SEC does not, and cannot, deny that StraightPath voluntarily refrained from soliciting new investments and has not diverted any investor assets to Defendants since the standstill went into effect three months ago. On the contrary, SEC accountant

1

Douglas J. Smith, whose purported financial analysis of StraightPath bank records forms the linchpin of the SEC's "emergency" application, testified at his deposition yesterday that StraightPath transferred no assets to any of the Defendants since the standstill began, and that he did not calculate any losses to StraightPath investors. (*See* Smith Dep. Tr. at 31-33).[1] At best, the SEC alleges that StraightPath is missing $14 million in pre-IPO stock needed to cover investments in certain StraightPath funds, meaning there is a shortfall in stock that has not yet gone public for which investors have not yet realized any actual losses. And that figure may be wildly overstated, as SEC accountant Smith, who calculated the alleged size of this stock deficit, admitted that he did not bother to review StraightPath's brokerage records because "it was a lot of work" and he "didn't have enough time," even though those records could show transfers of stock or cash to investors that could reduce that figure substantially. (*See id.* at 28-31).

Nevertheless, to allay any concerns the Court may have, StraightPath's owner Brian Martinsen and consultants Francine Lanaia and Michael Castillero are prepared to cover any such share deficit with $15 million of their own personal funds, just as Mr. Martinsen previously did when he used more than $3.3 million of his own money to cover a separate inadvertent stock shortfall that StraightPath self-reported to the SEC three months ago. That is the opposite of asset dissipation.

Defendants are also willing to consent to Court-ordered conditions requiring them to continue and expand upon the preexisting standstill and freezing the company's $206.8 million in assets — at least $7 million of which are firm assets not belonging to investors — pending the outcome of this litigation. Defendants would also agree to have Nardello & Co., a top-ranked

---

[1] The Smith deposition transcript is attached as Exhibit 5 to the declaration of Scott N. Sherman filed with this submission.

investigations firm, serve as an independent forensic examiner.  If allowed to do so, Nardello is prepared to immediately conduct a forensic audit of StraightPath's books and records, take further steps to ensure that investor assets are safeguarded, determine whether the company has enough funds to cover outstanding obligations to investors, and report its findings to the Court and SEC.

*The Court should not freeze personal assets.*  Even if the SEC offered compelling proof of historical securities law violations by StraightPath — which is not the case — it has failed to carry its burden to freeze the personal assets of Mr. Martinsen, Ms. Lanaia and Mr. Castillero during this litigation.  The SEC states that it seeks to freeze assets to ensure payment of any disgorgement that may be awarded if it were to prevail at trial.  But in the wake of the Supreme Court's decision in *Liu* v. *SEC*, 591 U.S. __, 140 S. Ct. 1936 (2020), the SEC can no longer seek disgorgement of funds that are not commensurate with actual investor losses.  Accordingly, the maximum potential amount of allegedly ill-gotten gains that the SEC could ever hope to disgorge from these individual defendants would be $14 million because that is the highest conceivable amount of investor losses that the SEC's allegations could possibly support.  The sum these individual defendants are willingly providing as pretrial security — totaling $22 million in cash and stock — is nearly double the SEC's maximum potential disgorgement recovery.

That is more than adequate to assure payment of any potential disgorgement award, particularly given that the SEC has failed to offer any credible evidence of investor asset dissipation or cognizable investor losses of any kind.

*The Court should not appoint a receiver or order a verified accounting.*  Not only is there no need for an emergency receiver in this case, but appointing one risks the imposition of undue burdens on the individual Defendants' constitutional rights and costly burdens.  Instead, the Court-ordered restrictions and independent forensic examiner that StraightPath has proposed are far

better tools that can be targeted at protecting investors during this litigation without the downsides of a receiver. For substantially similar reasons, the SEC also has failed to meet its burden to show that it is entitled to a verified accounting, which is unnecessary in light of the independent forensic audit proposed by the defense.

**_The SEC's claims will likely fail._** Because the Defendants are willing to consent to the Court-ordered safeguards described above, the Court need not grapple at this juncture with whether the SEC has met its burden of showing a substantial likelihood of winning its claims. In any event, the SEC's claims are unsupported — and in many instances contradicted — by the limited evidence that the SEC has produced to date, and thus are unlikely to withstand pretrial litigation and trial. For example, the SEC's primary claims — asserting that the Defendants deliberately made misrepresentations to conceal mark-ups charged to investors and sell shares that the company did not yet own — are flatly contradicted by StraightPath's disclosures notifying investors that the company could charge mark-ups and raise investor capital before buying the stock. *See, e.g.*, Section IV, *infra.* Those disclosures and other evidence defeat any conceivable argument that the Defendants acted with the intent to hide those matters through fraud. These and other defects in the SEC's claims — including the lack of any allegations of realized investor losses — illustrate the flimsiness of the SEC's theories of liability and the likelihood that its claims will fail.

**_The Court should not reward the SEC's gamesmanship._** The SEC has used coercive tactics to pressure the individual Defendants into invoking their Fifth Amendment rights so that it can exploit the adverse inference that can sometimes follow.

As part of this litigation, the SEC has now begun to dribble out disclosures revealing that six months ago, in the midst of its investigation, the SEC prompted the United States Attorney's Office for the Southern District of New York (the "Office") to open a related criminal investigation

into StraightPath. Without disclosing the existence of this criminal probe, the SEC induced the Defendants to make settlement presentations to the SEC in March and April 2022, and then abruptly demanded in April 2022 that the individual defendants sit for investigative testimony. That alone raises disturbing questions about whether the SEC was trying to set an unlawful "perjury trap" for the Defendants or was otherwise impermissibly coordinating with the Office. Unaware of the potential jeopardy that the SEC concealed, the Defendants agreed to sit for testimony on proposed dates in June and July 2022.

Rather than take their testimony, however, the SEC threatened on May 6, 2022 to bring this emergency relief application if the Defendants did not agree to unconscionable settlement terms, and disclosed for the first time the existence of the criminal investigation. After the Defendants declined to do so, the SEC filed this enforcement action and asset freeze application.

If the Office believed that there was sufficient evidence to bring criminal charges against the Defendants, it almost certainly would have done so when the SEC announced its civil claims. The Office did not. Nevertheless, as the SEC is undoubtedly aware, the specter of a criminal probe — even one that seems to be going nowhere — makes the potential dangers of testifying in a civil SEC matter so great that those who are innocent of any wrongdoing may elect not to do so based on their Fifth Amendment rights.

After declining to take investigative testimony from the Defendants when it could have, the SEC sought to exploit the existence of a bogus criminal probe that the SEC itself ginned up to force them to assert their Fifth Amendment rights in response to the SEC's demands for expedited depositions of them in this case. Nevertheless, the Defendants offered to provide deposition testimony if the SEC requested that the Office obtain orders immunizing them from the use of their

statements in any criminal prosecution, while preserving the Office's right to prosecute if it develops independent proof any criminal wrongdoing (which it will not). The SEC refused.

As a result of the SEC's gamesmanship, the Defendants had no practical choice but to invoke their Fifth Amendment rights. The SEC should not be rewarded for its cutthroat tactics. The Court should decline to draw any adverse inferences from their respective decisions to invoke their constitutional rights.

For these reasons and the reasons set forth below, the Court should deny the SEC's application for emergency relief in its entirety, and should not draw any adverse inferences against the individual Defendants for invoking their constitutional rights.

## BACKGROUND

The SEC's application for emergency relief misstates and omits irrefutable facts that are critical to the Court's evaluation of whether the SEC has met its burden (which it has not) to freeze the personal assets of individual Defendants, appoint a receiver to take control of their personal assets as well as the company's assets, and require a verified accounting.

### A. The SEC Fails to Disclose that StraightPath Distributed Hundreds of Millions of Dollars in Returns to Investors

The SEC fails to disclose to the Court that StraightPath earned and distributed hundreds of millions of dollars in investment returns to the company's investors. In reality, investors got what they bargained for, and in those rare instances where StraightPath inadvertently oversold interests in pre-IPO shares, there are more than enough funds available to cover the shortfall. That is no Ponzi scheme.

StraightPath was founded in 2017 as a small, boutique private equity firm with the business model of offering qualified investors the opportunity to purchase investments in StraightPath funds that would provide exposure to underlying pre-IPO stock shares. According to the SEC,

StraightPath raised a total of approximately $410 million in capital contributions from investors between 2017 and February 2022, in exchange for investments in StraightPath funds. (*See* SEC Compl. at ¶ 2 (Dkt. 1)). In soliciting such investments, StraightPath provided each investor with offering documents including a private placement memoranda ("PPM"), which disclosed, among other things, that to carry out its strategy for earning returns on investors' contributions, StraightPath expected to use those contributions to purchase the pre-IPO stock that would back their investments, and to sell the stock at a mark-up to the funds in which investors were buying. (*See* SEC Mem. (Dkt. 8) at 4); Genet Decl. (Dkt. 12) at ¶ 2); Genet Decl., Ex. 1 (PPM) at 2, 10).

Consistent with those PPM disclosures, StraightPath in fact used hundreds of millions of dollars raised from investor contributions to buy underlying pre-IPO shares, according to the SEC's own financial analysis. (*See* Smith Decl. (Dkt. 10) at ¶¶ 59; Smith Decl., Ex. 10). StraightPath currently has at least $206.8 million in cash and stock. (*See* SEC Mem. at 31-32). At least $7 million of those assets (and likely much more) consist of stock owned by the firm, as opposed to investor assets under management. While SEC accountant Smith highlights an alleged shortfall of $14 million in StraightPath's holdings of seven pre-IPO stocks offered to investors, Defendants have determined through expedited discovery that Smith *also* conducted calculations and analyses (not disclosed in his declaration to the Court or in the SEC's accompanying moving papers) showing that the StraightPath funds have a significant *surplus* in its holdings of ten other pre-IPO shares not sold to investors. (*See* Smith Dep. Tr. at 141; Sherman Decl. at ¶ 41 and Ex. 6). A spreadsheet prepared by Smith before this lawsuit but produced by the SEC this afternoon — following Smith's deposition, and only after protracted negotiation between Defendants' counsel and SEC staff — reveals Smith's apparent conclusion that ten of

StraightPath's pre-IPO stock holdings have a surplus (not a deficit) of more than $24 million. (*See* Sherman Decl., Ex. 6).[2] Smith testified that he calculated an additional $17 million in investor inflows of capital that he did not assign to any pre-IPO stock holdings (*see* Smith Dep. Tr. at 71). Thus, even under the most conservative possible assumptions, that would leave a balance of $7 million in value owned by StraightPath.

The SEC makes much of the sums that StraightPath paid in compensation to the Defendants, but fails to disclose to the Court anything about the enormous returns the company generated for its investors. The SEC is well aware that StraightPath has bought and distributed stock and cash to investors but chose not to have its accountant Smith calculate the amount of the distributions, or the investors' profits or returns on their investments. (*See* Smith Dep. Tr. at 29-31). The defense expects that an independent audit by Nardello would show that StraightPath paid hundreds of millions of dollars in stock and cash to investors from legitimate proceeds of pre-IPO stock holdings going public. In contrast, StraightPath paid a total of nearly $75 million in compensation to Mr. Martinsen, Ms. Lanaia and Mr. Castillero from 2017 through February 2022, which is equivalent to an average of $6.5 million per year for each of them during that multi-year period. Their compensation is a reasonable and appropriate fraction of the substantial returns that they earned for and distributed to StraightPath investors.

**B.    The SEC Fails to Disclose Details About StraightPath's Cooperation Efforts**

The SEC fails to disclose to the Court that StraightPath has been cooperating for years with the investigation that led to this lawsuit, and omits critical details about those cooperation efforts.

**1.  The Initial Phase of StraightPath's Cooperation**

---

[2] A total of $24,730,372.51 was calculated using Smith's analysis (*see* Ex. 6 to Sherman Decl.) and multiplying the net share surplus by the average price per share sold.

StraightPath has been cooperating in good faith with the SEC enforcement staff's investigation for years. On November 12, 2020, in the midst of the global COVID-19 pandemic, the staff served their initial subpoena on StraightPath requesting 18 categories of documents and information. (*See* Sherman Decl. at ¶¶ 4-7 and Ex. 1). Without the aid of counsel, StraightPath engaged in time-consuming, labor-intensive efforts to comply with those and a series of supplemental document requests that followed from the staff. (*See id.*). From November 2020 through August 2021, StraightPath made productions of thousands of pages of documents to cooperate with various SEC requests. (*See id.*).

To assist the company in its efforts to cooperate with the SEC's investigation, StraightPath engaged counsel in September 2021 after the challenges posed by the pandemic made it untenable for the company to respond to the SEC's requests on its own.[3] (*See id.*). From September 2021 through February 2022, StraightPath and its counsel cooperated with a litany of requests from the SEC for documents and information, including by collecting, reviewing, and producing voluminous sets of documents (including extensive emails and tens of thousands of text messages collected from various individual defendants' personal devices), participating in innumerable calls and interviews with StraightPath representatives to address questions from SEC staff, proffering information in letters and on calls with SEC staff, and agreeing to make five StraightPath representatives available for testimony with SEC staff in March 2022. (*See id.* at ¶ 9).

### 2. StraightPath Voluntarily Agreed to a Standstill of its Business in February 2022

---

[3] The pandemic, for example, prompted the shutdown of StraightPath's offices in lower Manhattan, required individuals associated with the company to transition to remote work, and resulted in the relocation and dispersion of various individuals associated with the company to different states throughout the country. (*See* Sherman Decl. at ¶¶ 7-9 and Ex. 1). After almost a year of rolling document productions in the midst of the pandemic, SEC staff raised concerns to StraightPath that the company's document productions were incomplete, further prompting StraightPath to engage counsel. (*See id.*).

In February 2022, StraightPath initiated settlement discussions with the SEC to explore whether the SEC would agree to a resolution under which the company would not admit or deny the veracity of the SEC's alleged concerns. (*See id.* at ¶ 10). During these discussions, StraightPath and the SEC agreed on February 18, 2022 to the following arrangement to facilitate settlement discussions. (*See id.* at ¶¶ 10-13). *First*, based on assurances from the SEC that it was open to reaching a settlement without testimony if its concerns were addressed, StraightPath authorized its counsel to proffer information through presentations to the SEC pursuant to Federal Rule of Evidence 408 in lieu of testimony to respond to any factual questions that the SEC needed to resolve in order to reach a just settlement. (*See id.*).[4] *Second*, to allow the parties to focus their efforts on settlement, the parties agreed to adjourn testimony and instead hold control dates for potential testimony from StraightPath witnesses in the event that a settlement could not be reached. (*See id.*).

At the SEC's request and as a show of good faith toward reaching a settlement without testimony, StraightPath also agreed on February 18, 2022 to a standstill of its business under which StraightPath voluntarily undertook to abide by the following conditions (among others): (a) StraightPath agreed to return any investment funds received after February 18; (b) StraightPath agreed not solicit any new investments after February 18; and (c) StraightPath agreed to provide to the SEC information sufficient to identify any planned distributions of cash or stock to investors that would occur on or before April 8. (*See id.* at ¶ 13). On March 7, 2022, StraightPath agreed

---

[4] The SEC's moving papers contain numerous references to documents, evidence and information that the Defendants disclosed to the SEC in Rule 408 settlement discussions. The Defendants are in the process of seeking discovery into whether the SEC improperly based any of its allegations on or otherwise improperly used protected settlement statements in violation of Rule 408(a). The Defendants reserve all their rights under Rule 408(a), and reference settlement information in this submission only for purposes authorized by Rule 408(b).

at the SEC's request to supplement this standstill with an additional undertaking to provide the SEC with four business days' advance notice of any distributions of cash or stock to StraightPath investors and of any expenditures in excess of $10,000 by StraightPath, subject to specified exceptions. (*See id.* at ¶ 15).

StraightPath has at all times complied with its obligations under the standstill, a fact which the SEC has failed to address (let alone deny) in its moving papers. To be sure, the SEC attempts to create the misimpression that StraightPath dissipated assets during the standstill, by alleging that the company "continue[s] to commingle investor assets and make distributions from these assets." (SEC Mem. at 2). Those allegations are baldly misleading. *First*, the distributions to which the SEC refers were paid to StraightPath investors, not to the Defendants (*see* Smith Dep. Tr. at 31), and thus represent efforts by the Defendants to honor their obligations to investors, not attempts to dissipate their assets. *Second*, while StraightPath has not taken any steps to separate or disturb investor assets that may have been sloppily commingled before the standstill, the SEC's moving papers make no allegation and present no evidence that StraightPath has taken any new or active steps to solicit or commingle new investor funds during the standstill. *Third*, as part of its efforts to cooperate with the SEC's inquiry, StraightPath gave the SEC advance notice on February 22, 2022 that the company planned to make those distributions to investors, and self-reported information to the SEC about the company's commingling of assets during Rule 408 settlement presentations. (*See* Sherman Decl. at ¶¶ 14, 18, 22-24).

The SEC did not object, complain, or ask any follow-up questions in response to StraightPath's February 22 notice concerning those planned distributions. (*See id.* at ¶ 14). It was only months later — when the SEC needed to develop pretexts to support the instant "emergency"

relief application — that the SEC first raised any questions or concerns about the sufficiency of that notice. (*See id.* at ¶¶ 14, 32).

### 3. StraightPath Self-Reports Information about Document Preservation Issues

The SEC also fails to disclose to the Court that, during a Rule 408 settlement presentation in February 2022, StraightPath brought to the SEC's attention the May 2021 document preservation incident described in the SEC's moving papers (*See* SEC Mem. at 14-16; Sherman Decl. at ¶ 11), or that StraightPath's counsel directed the SEC to exculpatory evidence consisting of contemporaneous text messages and communications suggesting that the company deleted the email *accounts* of rogue referral agents to stop them from misrepresenting that they were associated with the company in soliciting investments, and plainly did not intend to delete the underlying emails or otherwise obstruct any then-outstanding SEC subpoenas. (*See* Sherman Decl. at ¶ 11 and Ex. 2).

### 4. StraightPath Proffers Information to Address the SEC's Alleged Concerns

On February 23, 2022, the SEC provided StraightPath with a list of multiple topics the SEC wanted StraightPath to address during a Rule 408 presentation on March 7, 2022. (*See id.* at ¶ 16). StraightPath and its counsel collectively devoted hundreds of person-hours to collecting, organizing, and summarizing documents and information to prepare for the presentation, which StraightPath's counsel delivered pursuant to Rule 408 over the course of about three hours on March 7. (*See id.* at ¶ 17).

Subsequently, the SEC asked StraightPath to make a further Rule 408 presentation on April 4, 2022 to address new questions the SEC had raised about various inter-fund transfers of money by StraightPath, and the SEC also made follow-up requests for documents sufficient to assure the SEC that StraightPath beneficially owned enough pre-IPO shares to satisfy outstanding

investments. (*See id.* at ¶¶ 18-20). StraightPath asked the SEC to propose what, if any, relief it would seek to settle its inquiry, including an estimated range of any financial penalties that it would seek in any settlement. (*See id.*). In its March 17, 2022 response, the SEC made statements that induced StraightPath's counsel to believe that after that presentation and the production of those documents, the SEC would propose settlement terms as requested. (*See id.*). In reliance on those statements by the SEC, StraightPath and its counsel undertook hundreds more hours of work to collect, produce and present information and documents addressing these additional topics. (*See id.* at ¶¶ 21-24). As part of these efforts, StraightPath's counsel delivered a one-hour presentation to the SEC pursuant to Rule 408 on April 4, 2022 on the topic of inter-fund transfers. (*See id.*).

### 5. Mr. Martinsen Contributes Rather than Diverts Funds Into StraightPath

Rather than diverting assets from StraightPath as the SEC misleadingly suggests, the company's owner Mr. Martinsen recently contributed millions of dollars of his own assets to prevent harm to StraightPath investors from an inadvertent shortfall in the company's holdings of pre-IPO shares of Rubrik stock. As the SEC concedes, "[s]ince the end of March 2022, Martinsen has transferred more than $3.3 million from his personal bank accounts into the [StraightPath] Fund Manager bank account in order to cover the purchase of two blocks of Pre-IPO Shares of Rubrik." (SEC Mem. at 9). StraightPath disclosed to the SEC in late March 2022, while StraightPath and its counsel were preparing for the April 4 presentation, that StraightPath had previously made commitments to buy both blocks of Rubrik shares because the company unintentionally, through its own haste and disorganized bookkeeping, failed to acquire enough shares to cover all outstanding Rubrik investments in StraightPath funds. (*See* Sherman Decl. at ¶¶ 24-28). In addition, StraightPath agreed that after its counsel made the settlement presentation planned for April 4, the company's counsel would present on April 28, 2022 on the results of an

13

internal review that the company was undertaking to of its records of purchases and sales of pre-IPO stock to determine whether it had enough to cover investments in several prior offerings. (*See id.*).

With full awareness of the potential shortfall in shares that prompted the foregoing, the SEC allowed Mr. Martinsen to close on the purchase of millions of dollars in Rubrik shares using his own funds, and received the April 4 presentation from StraightPath's counsel, all without seeking any judicial intervention. (*See id.*).

### 6. The SEC Abruptly Terminates Settlement Discussions

In correspondence on April 8, 2022, the SEC provided StraightPath's counsel with guidance on topics to address at the Rule 408 presentation scheduled for April 28, and abruptly demanded "firm dates" for testimony from five StraightPath representatives in April and May 2022. (*See id.* at ¶¶ 28-31). In good faith, the company proposed on April 18, 2022 to make the witnesses available for testimony on dates in June and July 2022. (*See id.*). The SEC complained on April 20, 2022 that it wanted testimony earlier, and StraightPath responded on April 22, 2022 that the proposed dates in June and July were the soonest that it could make those witnesses available for a host of logistical reasons. (*See id.*).

Over the next thirteen days, the SEC made a series of other demands for documents and information from StraightPath and started making baseless accusations that the company had violated the standstill by making distributions to investors, even the SEC had notice of those distributions as of February 22, 2022. (*See id.* at ¶ 32). During this period, StraightPath continued its efforts to cooperate with the SEC's investigation and comply with the standstill. (*See id.* at ¶¶ 32-33). For example, StraightPath provided advance notice to the SEC on May 2, 2022 that it

intended to follow through with the purchase of the second block of Rubrik shares mentioned above, which Mr. Martinsen again bought using his own funds. (*See id.*).

### 7. The SEC Threatens "Emergency" Relief to Leverage An Unfair Settlement

The SEC's moving papers fail to inform the Court that, a week before filing the instant application on May 6, 2022, the SEC informed StraightPath that if it did not agree to concede liability on securities fraud charges that it was then-proposing for the first time — without any proposal (let alone agreement) on the amount of any financial penalties that would be imposed as a result — the SEC would file this lawsuit and emergency relief application. (*See id.* at ¶¶ 34-36).

During the same May 6 conversation, the SEC also advised for the first time that the StraightPath's counsel should contact the Office because the Office was conducting a criminal investigation relating to this matter. (*See id.*). The assigned Assistant United States Attorney from that Office subsequently confirmed the existence of a criminal investigation of StraightPath for issues that overlap with the SEC's inquiry "for a while now." (*See id.*). Recent disclosures by the SEC reveal that that the SEC prompted the Office to open a criminal investigation into StraightPath at some point last year and has been communicating with the Office about this matter since at least as early as December 2021. (*See id.* at ¶ 37).

There can be no serious dispute that the SEC and the Office have been coordinating their StraightPath inquiries since at least December 2021. The SEC Enforcement Manual provides that SEC Enforcement "staff is encouraged to work cooperatively with criminal authorities, to share information, and to coordinate their investigations with parallel criminal investigations" (SEC Enforcement Manual § 5.2.1), that "staff is encouraged and expected to maintain periodic communication with the criminal authorities concerning the status of any criminal investigation"

(*id.* § 5.6.1), and that "it is appropriate for criminal authorities to ask SEC staff to refrain from taking actions that would harm the criminal investigations" (*id.* § 5.2.1).[5]

These facts raise a plausible inference that the SEC and the Office were coordinating when the SEC induced the Defendants to make settlement presentations to the SEC in March and April 2022, and then abruptly demanded in April 2022 that the individual Defendants sit for investigative testimony. That the SEC did so without disclosing the existence of the Office's criminal probe to the defense raises troubling questions about whether the SEC was seeking to set an unlawful "perjury trap" for the individual defendants. *See United States* v. *Scrushy*, 366 F. Supp. 2d 1134, 1139 (N.D. Ala. 2005). To get to the bottom of this issue, the Defendants have requested that the SEC disclose its communications with the Office about this matter, but the SEC has thus far refused.

### 8. StraightPath Proposes Voluntary Undertakings to Address the SEC's Concerns

The SEC's application also fails to disclose to the Court that on May 8, 2022, five days before the SEC filed this "emergency" application, the Defendants proposed to consent to a Court order requiring that they abide by a series of investor protection measures to obviate the need for the SEC's motion. These proposed measures, which are detailed in our May 13 letter to the Court (*see* Dkt. 15 at 3-4), were rejected by the SEC, which chose instead to file this lawsuit and application on May 13 (Dkts. 1, 8) followed by a May 16 press release excoriating the Defendants (*see* Sherman Decl. at ¶ 38 and Ex. 4).

### C. The StraightPath Defendants' Proposed Relief to Protect Investors Pending the Outcome of this Litigation

---

[5] The Manual is available at https://www.sec.gov/divisions/enforce/enforcementmanual.pdf.

While the SEC's claims are meritless, the Defendants are willing to consent to Court-ordered conditions imposing the following investor protections pending the outcome of this litigation to allay any concerns the Court may have:

- **_Business Standstill._**  The Defendants would continue and expand the previously agreed-upon standstill.  Specifically, the Defendants would not solicit any new investments for StraightPath, and the company (absent advance approval from the SEC or Court) would not make any further distributions of stock or cash to investors, purchases of or sales of stock, or any other expenditures.

- **_Voluntary Escrow._**  StraightPath's owner Mr. Martinsen and consultants Ms. Lanaia and Mr. Castillero would collectively contribute $15 million of their own funds into an escrow account to be available to cover any stock shortfalls or any disgorgement that may be awarded for the benefit of investors if the SEC prevails on its claims in this litigation.

- **_Corporate Asset Freeze._**  Defendants would also consent to the Court freezing StraightPath's assets, which according to the SEC are worth at least $206.8 million.  At least $7 million of those corporate assets consist of firm-owned stock, as opposed to investor assets under management.

- **_Independent Forensic Auditor._**  StraightPath would agree to be subject to an independent audit by Nardello & Co., a top-ranked investigations firm.  Nardello has already been retained and is prepared immediately to (among other things): (a) conduct a forensic audit of StraightPath's books to further ensure that investor assets are safeguarded and that there are sufficient funds and stock available to cover amounts owed to investors; (b) calculate the income and expense figures needed to determine any claimed disgorgement quantum in the event that the SEC were to prevail; and (c) report its findings to the SEC and Court.

- **_Independence Protections._**  StraightPath has agreed that it will not have the authority to terminate Nardello without Court or SEC approval, there is no privilege over StraightPath's communications with Nardello, and Nardello will not work for StraightPath for two years after the completion of this engagement.  Nardello would be paid at its customary hourly rates by Mr. Martinsen, Ms. Lanaia and Mr. Castillero.

## ARGUMENT

### I.     The SEC Fails to Satisfy its Burden to Freeze Personal Assets

Even if the SEC could show historical securities law violations by StraightPath — which is not the case, as explained below (in Part IV at 31) — the SEC has failed to carry its burden to justify a pretrial freeze of the personal assets of Mr. Martinsen, Ms. Lanaia and Mr. Castillero.

Because freezing defendants' assets might "cause such disruption of defendants' business affairs that they would be financially destroyed," the "decision to order a temporary freeze on defendants' assets as ancillary relief in an SEC enforcement action requires particularly careful consideration by the district court." *SEC* v. *Manor Nursing Centers, Inc.*, 458 F.2d 1082, 1105 (2d Cir. 1972).

Bearing that in mind, the SEC's request to freeze personal assets — over and above the $22 million in cash and stock that will be frozen or placed in escrow under the Defendants' proposal — should be denied. That sum is nearly double the SEC's maximum potential disgorgement recovery in this case based on the way in which the SEC has framed its claims and the restrictions imposed by *Liu* v. *SEC*, 591 U.S. __, 140 S. Ct. 1936 (2020). Nor is there any serious need or justification for freezing personal assets (on top of the $22 million in assets offered by the defense) given the SEC's failure to offer any credible evidence of investor asset dissipation by the Defendants or of any cognizable investor losses that may need to be recompensed with frozen assets. Under the circumstances, freezing personal assets would be excessive, and would also place an undue burden on the individual Defendants' constitutional rights to secure the counsel of their choice to defend themselves in the criminal investigation prompted by the SEC.

## A. The SEC Fails to Show Investor Losses to Justify Freezing Personal Assets

To justify freezing a defendant's assets before trial, the SEC must make a credible showing that securing those assets is necessary to compensate investors for losses caused by the defendant's alleged misconduct. The purpose of such an asset freeze is to ensure that the SEC will be able to disgorge sufficient funds from a defendant to compensate injured investors if the SEC prevails at trial. *See Manor Nursing*, 458 F.2d at 1106.

The Supreme Court made clear in *Liu*, however, that if the SEC proves its entitlement to disgorgement relief, the amount disgorged cannot "exceed a wrongdoer's net profits" from a securities violation and must be "awarded for victims." *Id.* at 1940.

The *Liu* Court examined whether the SEC's authority to seek "equitable relief" under 15 U.S.C. § 78u(d)(5) includes disgorgement. In interpreting what the statute meant by "equitable relief," the Court looked to the body of equity precedents in place when the statute was enacted, noting that they recognized a disgorgement remedy allowing courts to strip wrongdoers of their ill-gotten gains, but restricted the remedy to an individual wrongdoer's net profits to be awarded for victims. *See id.* at 1945-46. Accordingly, the Court held that "[b]y incorporating these longstanding equitable principles into § 78u(d)(5), Congress prohibited the SEC from seeking an equitable remedy in excess of a defendant's net profits from wrongdoing." *Id.* at 1946. The Court also ruled that SEC's historical practice of distributing disgorgement awards to the government rather than to victims was "in considerable tension with equity practices" (*id.*) under which this "remedy generally requires the SEC to return a defendant's gains to wronged investors for their benefit" (*id.* at 1948). As a result, the Court determined that the SEC's authority to seek "equitable relief" under § 78u(d)(5) allows the SEC to seek "a disgorgement award that does not exceed a wrongdoer's net profits and is awarded for victims" (*id.* at 1940).[6]

---

[6] Although Congress amended 15 U.S.C. § 78u after *Liu* to authorize the SEC to seek "disgorgement" (*see* 15 U.S.C. §§ 78u(d)(3)(A)(ii) and (A)(7)), those amendments merely incorporate into the statute (and do not undercut) the limitations that *Liu* placed on the SEC's disgorgement authority. *See Liu*, 140 S. Ct. at 1947 ("even if Congress employed 'disgorgement' as a shorthand to cross-reference the relief permitted by § 78u(d)(5)," that would "not expand the contours of that term beyond a defendant's net profits"); *see also Stokeling* v. *United States*, 586 U.S. __, 139 S. Ct. 544, 551 (2019) ("If a word is obviously transplanted from another legal source, whether the common law or other legislation, it brings the old soil with it."); *New York* v. *Nat'l Highway Traffic Safety Admin.*, 974 F.3d 87, 98 n.63 (2d Cir. 2020) (it should be "assume[d] that Congress legislated against a background of law already in place").

Accordingly, it follows that to justify a pretrial asset freeze for victims' benefit, the SEC must make a credible showing that there are actual victims with actual losses to be recompensed through disgorgement of the frozen assets. If that were not so, the SEC would be able to freeze assets in aid of disgorging them for government coffers, a practice that the Supreme Court called into question in *Liu*. *See id.* at 1946.

Although the SEC has been investigating StraightPath for years, its application offers zero evidence that even a single StraightPath investor has realized any actual losses as a result of the alleged violations. The SEC's moving papers proffer no affidavit, no witness statement, and no testimony from any alleged victim, let alone any proof of cognizable losses of any kind by an alleged victim. In a futile attempt to backfill this hole in its case, the SEC relies on allegations by SEC accountant Smith that StraightPath is missing $14 million in pre-IPO shares needed to cover outstanding investments. There is serious reason to question whether that figure is overblown, in light of the glaring flaws in Smith's analysis (such as his failure to review or consider StraightPath's brokerage records) that were exposed during his deposition testimony. (*See supra* at 1-2; *see also, e.g.*, Smith Dep. Tr. at 31-33, 45). But even assuming there was a deficit of $14 million in pre-IPO shares, the investors who bought StraightPath fund interests to obtain exposure to those shares would not be entitled to any distribution of cash or stock until the underlying shares go public,[7] which has not happened. They therefore have not realized even a penny of losses at this juncture, and Mr. Martinsen, Ms. Lanaia and Mr. Castillero are prepared to furnish $15 million of their own funds to buy any shares needed to cover any such inadvertent shortfall. If permitted

---

[7] The PPMs that StraightPath provided to investors disclosed that StraightPath has discretion to determine the timing of distributions of cash or stock to investors after a liquidation event (such as when pre-IPO stock goes public), provided that the distributions must be made within a year of the liquidation event. (*See* Genet Decl., Ex. 1 at 10).

to do so, the $14 million in potential losses that the SEC cites could be avoided with $1 million to spare.

In light of *Liu* and the logic of the SEC's own allegations (*see* SEC Mem. at 2, 7, 20), the maximum potential amount of disgorgement that the SEC would be entitled to recover if it prevails in this litigation would be roughly $14 million. To be sure, the SEC asserts that a victory on its claims "could expose [Mr. Martinsen, Ms. Lanaia and Mr. Castillero] to disgorgement of their full compensation" from StraightPath (*see id.* at 30), which the SEC asserts was nearly $75 million for all three (*see id.* at 1). But the SEC is not permitted to disgorge every penny earned from an alleged violation under *Liu*. Rather, *Liu* requires that the amount of disgorgement must be tethered to redressing actual investor losses. And here, the highest conceivable amount of investor losses that the SEC's allegations can possibly support would be $14 million to cover the purported stock shortfall cited by the SEC.

In this regard, the SEC notably chose to rest its request to freeze assets in this case entirely on claims that it needs those assets to secure any disgorgement that may be awarded to recompense investors. (*See id.* at 30). As stated by the SEC: "The proposed asset freeze would ensure that sufficient funds are available to satisfy any final judgment the Court might enter ordering payment of disgorgement." (*Id.*).[8]

Under the circumstances, the Defendants' willingness to provide $22 million in assets, or nearly double the SEC's maximum potential disgorgement recovery, in pretrial security is more

---

[8] The SEC should not be able to amend or expand the claimed grounds for its asset freeze request in reply. *See, e.g.*, *Connecticut Bar Ass'n* v. *United States*, 620 F.3d 81, 91 n.13 (2d Cir. 2010) ("Issues raised for the first time in a reply brief are generally deemed waived."); *American Infertility of New York, P.C.* v. *CNY Fertility, PLLC*, 2021 WL 4803539, at *1 (S.D.N.Y. Oct. 13, 2021) (movant's failure to address an issue until reply brief, "would be reason enough to deny [the] motion").

than sufficient. Because a further freeze of the personal assets of Mr. Martinsen, Ms. Lanaia and

Mr. Castillero during this litigation is not necessary to protect any investors, the Court should deny

it. *See SEC* v. *Morgan*, 2019 WL 2385395, at \*11 (W.D.N.Y. June 5, 2019) (denying asset freeze

in part because "the Court is not persuaded at this time that an asset freeze is necessary for the

protection of investors").

**B.     The SEC Fails to Present Credible Evidence that the Defendants will Dissipate
         Assets in the Future to Justify Freezing Personal Assets**

The SEC's request to freeze personal assets also fails because the SEC has proffered no

credible evidence that anyone at StraightPath will dissipate or divert investors assets in the future.

An asset freeze is appropriate only if there is a "significant risk of the dissipation of

defendants' assets during the course of the litigation." *FTC* v. *Campbell Capital LLC*, 2018 WL

5781458, at \*4 (W.D.N.Y. Oct. 24, 2018) (citing *Manor Nursing*, 458 F.2d at 1106); *SEC* v.

*Santillo*, 2018 WL 3392881, at \*2 (S.D.N.Y. July 11, 2018) (in order to obtain an asset freeze, the

SEC must offer sufficient cause for "concern that the defendant will dissipate the assets within the

defendant's control or will transfer the assets beyond the jurisdiction of the United States'"); *see

also SEC* v. *Infinity Grp. Co.*, 212 F.3d 180, 197 (3d Cir. 2000).

The SEC's application is devoid of any credible proof that the Defendants will dissipate

any investor assets going forward. The SEC does not, and cannot, deny that StraightPath (which

currently has well over $100 million in investor assets according to the SEC) has not diverted any

investor assets to the Defendants since their voluntary business standstill went into effect on

February 18, 2022. SEC accountant Smith admitted as much yesterday. (*See* Smith Dep. Tr. at

28-31). Moreover, given the Defendants will consent to the Court freezing all of StraightPath's

$206.8 million in corporate assets, there is no risk of them dissipating any investor assets held by

the company.

The SEC has not shown, and cannot show, that all the individual Defendants' personal assets represent investor assets at risk of being diverted. The only purported proof the SEC offers on this point presumes (i) that the company has always had enormous stock shortfalls and (ii) that therefore the $75 million in compensation paid to the individual Defendants since 2017 must represent diverted investor funds. Both assumptions are baseless. After years of investigating StraightPath and poring through its bank records, the SEC has alleged at most a shortfall of $14 million in certain pre-IPO stocks (rather than a $75 million shortfall), which three individual Defendants are prepared to redress with $15 million of their own funds. The SEC offers no evidence that the other $60 million they received in compensation belongs to investors. Moreover, that alleged deficit may turn out to be significantly smaller than the SEC claims. As noted above, SEC accountant Smith, who calculated the alleged size of this stock deficit, has now admitted that he did not bother to review StraightPath's brokerage records because "it was a lot of work" and he "didn't have enough time" even though they could show transfers of stock or cash to investors which might reduce that figure. (*See id.*).

To manufacture asset diversion where there is none, the SEC also offers another baseless theory that StraightPath "continue[s] to commingle investor assets and make distributions from these assets" (SEC Mem. at 2), when in fact, the distributions referenced were paid to investors not the defendants (*see* Smith Dep. Tr. at 29-31).

None of the SEC's diversion theories withstands scrutiny. Because the SEC has failed to present any (let alone compelling) proof that Mr. Martinsen, Ms. Lanaia or Mr. Castillero will dissipate investor assets in the future, the SEC's request to freeze their personal assets should be denied. *See Morgan*, 2019 WL 2385395 at *11 (denying SEC request to freeze the defendant's

assets in part for lack of evidence of any attempts by the defendant to transfer or dissipate assets, notwithstanding compelling evidence that the defendant violated the securities laws).

## C.     The SEC's Attempt to Freeze Personal Assets Raises Constitutional Concerns

In light of the recent revelation that the SEC prompted the Office to open a criminal investigation into StraightPath, the sweeping personal asset freeze sought by the SEC also poses an undue risk of interfering with the individual Defendants' constitutional rights to obtain the counsel of their choosing to defend themselves in that criminal inquiry.

The "pretrial restraint of legitimate, untainted assets needed to retain counsel of choice [in a criminal matter] violates the Sixth Amendment." *Luis* v. *United States*, 578 U.S. 5, 10, 136 S. Ct. 1083, 1088 (2016). As a result, when the SEC requests an asset freeze that may hinder a defendant's ability to obtain counsel of his choosing in a related criminal proceeding, the court must pay "'particular attention to the defendant's Fifth and Sixth Amendment rights.'" *Morgan*, 2019 WL 2385395, at *11 (quoting *SEC* v. *Coates*, 1994 WL 455558, at *3 (S.D.N.Y. Aug. 23, 1994)). In this circumstance, the SEC bears the burden of providing evidence that the personal assets it seeks to freeze are traceable to the supposedly fraudulent conduct alleged in the civil case. *See Coates*, 1994 WL 455558, at *4 (citing *United States* v. *Monsanto,* 924 F.2d 1186 (1991)); *see also CFTC* v. *Walsh,* 2010 WL 882875, at *2 (S.D.N.Y. Mar. 9, 2010).

The SEC has failed to meet this burden. Although the SEC subpoenaed scores of documents in its multi-year investigation, the SEC offers no bank records, no brokerage statements, no financial tracing analysis, nor any other evidence establishing that all of the personal assets that the SEC seeks to freeze represent proceeds of alleged securities law violations at StraightPath. Nor could the SEC make such a showing, as all of the individual Defendants have earned significant, irrefutably untainted assets and income from sources having nothing to do with

StraightPath.  For example, it is undisputed that the individuals whose personal assets the SEC seeks to freeze — Mr. Martinsen, Ms. Lanaia and Mr. Castillero — all spent decades working in the finance industry before joining StraightPath in 2017.  (*See* SEC Mem. at 2).  The SEC offers no evidence quantifying the portion of their personal assets earned from pre-StraightPath sources or other non-StraightPath sources (such as relatives or other business activities) during their time at the company, let alone any evidence that these other sources of income were in any way tainted or illegitimate.

D.      **Any Personal Asset Freeze Should Carve-Out Living Expenses and Counsel Fees**

The temporary asset freeze ordered by the Court on May 13, 2022 at the SEC's request provides that "any amounts allowed by the Court, upon application by Martinsen, Castillero, and Lanaia, for reasonable living expenses, shall not be subject to the asset freeze." (Dkt. 16 at 13).  It is undisputed that if the Court decides to grant the SEC's request to extend that pretrial freeze over these individual defendants' personal assets, this carve-out for living expenses should also survive. In such a scenario, we also respectfully request that the Court expand this carve-out to allow these individual defendants to apply to the Court for approval to pay counsel fees for defending this litigation and the related criminal inquiry by the Office.  Doing so would not eliminate, but would mitigate, the constitutional concerns raised by a blanket freeze of their personal assets.

To defend themselves against these very serious accusations, Mr. Martinsen, Ms. Lanaia and Mr. Castillero will need access to significant funds to pay defense counsel.  This enforcement action and the related criminal investigation are high-stakes, complex securities matters stemming from a multi-year SEC investigation.  Defending the SEC action alone will require counsel to review extensive and voluminous discovery materials including millions of pages of documents,

interview or depose dozens of witnesses, research and evaluate whether to bring a variety of potential pretrial motions, and prepare for and conduct what will likely be a multi-week trial.

Courts routinely approve counsel fee carve-outs from asset freeze orders upon a proper showing that the funds to be released are untainted by the alleged fraud. *See SEC* v. *FTC Capital Markets, Inc.*, 2010 WL 2652405, at *7 (S.D.N.Y. June 30, 2010) (Gardephe, J.) (citing *SEC* v. *Stein*, 2009 WL 1181061, at *1 (S.D.N.Y. April 30, 2009) (Lynch, J.)). While this Court has held that frozen funds should not be released for counsel fees unless it is demonstrated that the amount frozen is in excess of the financial recovery sought by the SEC (*see SEC* v. *Bremont*, 954 F. Supp. 726, 733 (S.D.N.Y. 1997) (Kaplan, J.)), here there can be no serious dispute that the amount the Defendants are consenting to freeze or escrow (totaling $22 million) is well in excess of the SEC's maximum potential disgorgement award of $14 million from Mr. Martinsen, Ms. Lanaia and Mr. Castillero.

Accordingly, we respectfully request that any personal asset freeze ordered by the Court contain a carve-out affording Mr. Martinsen, Ms. Lanaia and Mr. Castillero the opportunity to apply to the Court for the release of frozen personal assets to pay counsel fees.

## II.    The SEC Fails to Meet its Burden to Show that an Emergency Receiver is Needed

There is no need for an emergency receiver in this case, and appointing one risks undue burdens on the individual defendants' constitutional rights as well as excessive financial costs. Rather, the Court-ordered restrictions that the Defendants have proposed are better targeted at protecting investors during this litigation without the significant downsides of a receiver.

The purpose of appointing a receiver is to "prevent a diversion or waste of assets to the detriment of those for whose benefit" the injunctive action is being brought. *See SEC* v. *Universal Express, Inc.*, 2007 WL 2469452, at *3 (S.D.N.Y. Aug. 31, 2007) (citation omitted). But such an appointment is an "extraordinary remedy to be invoked only in cases of necessity and upon a clear

showing that an emergency exists" (*id.* (citation omitted)), and "should not follow requests by the SEC as a matter of course" (*Manor Nursing,* 458 F.2d at 1105).

The SEC has not made and cannot make that showing here. For the reasons explained at length above, there is no emergency nor any genuine risk of asset dissipation in this case. And apart from the absence of any emergency, the SEC's request for the appointment of a receiver also poses an undue risk that the receiver will retrospectively waive privilege over historical communications that could be harmful to StraightPath or the individual defendants in violation of their constitutional rights. During the SEC investigation that preceded this lawsuit, various individual Defendants engaged in extensive privileged communications with defense counsel via StraightPath email accounts, including confidential communications about defense strategy and other sensitive topics. (*See* Sherman Decl. at ¶ 8). If the Court were to appoint a receiver to take over StraightPath, the receiver could retrospectively waive the company's privilege over such communications, presenting the danger that privileged communications could be used to their detriment in violation of their Fifth and Sixth Amendment rights in this litigation or in the related criminal investigation.[9]

Appointing an independent forensic examiner in lieu of a receiver alleviates these privilege concerns (*see, e.g.*, *SEC* v. *GPB Capital Holdings, LLC*, No. 21 Civ. 00583 (MKB), Dkt. 39 (E.D.N.Y. Apr. 14, 2021)), and also conserves financial resources for the benefit of any investors who were theoretically harmed. The SEC itself has argued that independent third parties (such as monitors or examiners) are more likely "to hold down costs" than Court-appointed receivers. *See, e.g.*, SEC's *Ex Parte* Motion, *SEC* v. *Bivona*, 2016 WL 7645022, at *23 (N.D. Cal. Mar. 22, 2016)

---

[9] A receiver can retrospectively waive a company's privilege over the objection of its former principals. *See, e.g.*, *United States* v. *Beckman*, 2012 WL 1366064, at *1 (D. Minn. Apr. 19, 2012); *SEC* v. *Ryan*, 747 F. Supp. 2d 355, 367 (N.D.N.Y. 2010).

(arguing that "[i]n an effort to hold down costs, the [SEC] currently seeks an independent monitor, rather than a receiver, over the operations and assets of" the defendant companies).

The Court-ordered conditions proposed by the defense would obviate any conceivable need for a receiver without imposing such undue constitutional and financial burdens. As noted above, the Defendants will consent to Court-ordered safeguards requiring them to continue to expand the standstill of StraightPath's business, freeze or place in escrow $22 million as pretrial security for the benefit of investors, and allow Nardello & Co., one of the top-ranked investigative firms, to act as an independent examiner to perform a full forensic audit of the company's books. As part of this examination, Nardello would take immediate steps to further ensure that investor assets are protected and that there are sufficient funds to cover amounts owed to investors in all nine StraightPath funds, and report the results of its audit to the Court and SEC.

Those safeguards would be more than sufficient to protect investor assets during this litigation without presenting the constitutional concerns and excessive financial costs of an appointed receiver. Under the circumstances, the Court should deny the SEC's request to appoint a receiver as unnecessary and unduly burdensome, and instead adopt the StraightPath defendants' alternative proposal for protecting investor assets during this litigation.

### III.    The SEC Fails to Meet Its Burden To Justify a Verified Accounting

For substantially similar reasons, the SEC also has not made a showing that it is entitled to a verified accounting. In support of its request for such relief, the SEC relies on an unpublished opinion which found a sworn accounting was appropriate where the threat of dispersal of assets was "uncontested." (*See SEC* v. *Lybrand*, 2000 WL 913894, at *12 (S.D.N.Y. July 6, 2000), cited by SEC Mot. at 33). In contrast, the SEC has failed to provide any credible evidence of such a threat here. The only other authority the SEC cites is an opinion in a contempt proceeding for

failure to comply with an order for an accounting, which has not occurred here.  (*See SEC* v. *Oxford Capital Sec., Inc.*, 794 F. Supp. 104, 105-06 (S.D.N.Y. 1992), cited by SEC Mot. at 33).

## IV.     The SEC Fails to Show a Substantial Likelihood of Success on the Merits

To justify the sweeping restraints that the SEC seeks to impose even before its claims have been tried on the merits, the SEC must demonstrate a substantial likelihood that its claims will prevail on the merits.  *See Morgan*, 2019 WL 2385395, at \*5.

The SEC has simply not done this, but rather offers bombastic accusations and conclusory allegations, which are insufficient as a matter of law to carry its burden.  *See id.* at \*8 n. 3; *Cellular S. Inc.* v. *Merrill, Lynch, Pierce, Fenner & Smith, Inc.*, 516 F. App'x 30, 32 (2d Cir. 2013).  Indeed, the SEC's claims are unsupported, and in many instances contradicted, by the limited evidence that the SEC has disclosed to date at this preliminary phase of this litigation.  As such, it is apparent that the SEC's claims are unlikely to survive adversarial testing through discovery, pretrial motion practice, and trial.

For example, one of the SEC's main claims — that the Defendants deliberately made misrepresentations to conceal mark-ups charged to investors (*see* SEC Mem. at 12-14, 26) — are flatly contradicted by the record.  The PPMs that StraightPath sent to investors in soliciting investments in StraightPath funds contained repeated disclosures that StraightPath had discretion to buy pre-IPO stock and sell it at a mark-up to the StraightPath funds in which investors were buying interests, defeating any argument that they intended to defraud investors about this fact. One such disclosure in the PPMs stated:

> **Mark-Ups . . . . . . . . . . . . . . . .** StraightPath Affiliates may, to the extent permissible by law, may receive income generated from the sale of Interests with an underlying price per share of Portfolio Company security that is higher to the Fund than the price per share paid by the affiliate for such security.  None of the aforementioned fees or profits shall be shared with the Fund.

(Genet Decl., Ex. 1 at 10 (bold and ellipsis in original)). With the benefit of hindsight, the SEC complains that StraightPath should have phrased this disclosure to say that it always charged mark-ups, not merely that it could. (*See* SEC Mem. at 14). Even if that were so (which it is not), the SEC's claims at best establish that the Defendants may have made imprecise disclosures about mark-ups, not that they failed to disclose or lied to conceal them. Disclosures of fees, however inartful, are the opposite of a deliberate scheme to conceal fees.

Similarly, the SEC's other leading claim — alleging that the Defendants purported to sell investment interests in pre-IPO stock that they did not own with the intent to defraud investors (*see* SEC Mem. at 6-9) — also cannot withstand scrutiny. The PPMs that StraightPath issued to investors disclosed that StraightPath expected to use investors' capital contributions to purchase the pre-IPO stock that would back their investments (*see, e.g.*, Genet Decl., Ex. 1 at 2 ("The [StraightPath Fund] Manager expects to use the net proceeds [after fees] from the offering [of Fund interests to investors] to invest directly or indirectly in Portfolio Companies.")), making clear that they had no intent to hide that StraightPath did not own all the underlying stock when they solicited investments. Against that backdrop, the other assertions that the SEC relies on to allege fraudulent intent on this topic — such as the SEC's claims that StraightPath sent form welcome letters to investors with inaccurate statements about whether the company owned underlying stock (*see* SEC Mem. at 6) — are equally consistent with innocent mistakes. Good faith errors in document templates resulting from disorganized record-keeping are not proof of intentional fraud.

As a result, the fact that StraightPath discovered stock shortfalls after the relevant offerings (and brought such shortfalls to the SEC's attention months ago) is merely evidence that the company inadvertently lost track of how many interests in underlying stock it was selling, and is insufficient to prove an intent to deliberately overstate the amount of underlying stock on hand.

Any doubt about that is dispelled by (a) the fact that StraightPath's owner, Mr. Martinsen, used more than $3.3 million of his own funds to cover such a shortfall at a time when he was not charged with any wrongdoing (*see* SEC Mem. at 9), and (b) the examples cited by the SEC of instances where StraightPath returned more than $8 million to investors when it was unable to procure enough UiPath stock to back their UiPath investments (*see id.* at 8). Returning investor funds, rather than using lies to keep them, is not "Ponzi-like" behavior.

These and other deficiencies in the SEC's claims illustrate the flimsiness of their theories of liability and likelihood that its claims will fail when they are stress-tested by discovery, pretrial motion practice, and trial.

## V. The Court Should Not Draw Any Adverse Inference From the Individual Defendants' Invocation of their Constitutional Rights

The SEC should not be allowed to plug these holes in its case by coercing the individual Defendants into invoking their Fifth Amendment rights so that it can exploit the adverse inference that can sometimes (but need not and this case should not) follow. Due to gamesmanship by the SEC, the individual Defendants effectively had no choice but to invoke their Fifth Amendment rights in response to expedited deposition demands by the SEC in this case. The SEC should not be rewarded for its brass-knuckle tactics. The Court should decline to draw any adverse inferences from the Individual Defendants' respective decisions to invoke their constitutional rights.

As noted above, during the SEC investigation that led to this lawsuit, the SEC prompted the Office to open a criminal probe of the Defendants at least as early as December 2021. (*See* Sherman Decl. at ¶¶ 28-39). Without disclosing the existence of the criminal investigation to the defense, the SEC induced the defense to make settlement presentations to the SEC in March and April 2022, and then abruptly demanded in April 2022 that the individual Defendants sit for investigative testimony. (*See id.*). The individual Defendants agreed to do so on proposed dates

in June and July 2022. (*See id.*). Rather than take their testimony, the SEC threatened on May 6, 2022 to bring this action and emergency relief application if the individual Defendants did not agree to admit newly-proposed securities fraud charges without any predictions or assurances (let alone any resolution) as to the amount of financial penalties that would result. (*See id.*). During the same May 6 discussion, the SEC disclosed for the first time the existence of the criminal probe in the course of trying to induce the individual Defendants to settle on those wholly unreasonable terms. (*See id.*).

When the individual Defendants declined to do so, the SEC filed this enforcement action and "emergency" asset freeze application against them. If the Office believed that there was sufficient evidence to bring criminal charges against the individual Defendants, it almost certainly would have done so when the SEC announced its civil claims. Nevertheless, as the SEC is undoubtedly aware, the specter of a criminal inquiry — even one that seems to be going nowhere — makes the potential dangers of testifying in an SEC matter so great that those who are innocent of any wrongdoing elect not to do so based on their Fifth Amendment rights. The Supreme Court has "emphasized that one of the Fifth Amendment's basic functions is to protect innocent men [and women] who otherwise might be ensnared by ambiguous circumstances" because of the unfortunate reality that "truthful responses of an innocent witness, as well as those of a wrongdoer, may provide the government with incriminating evidence from the speaker's own mouth." *Ohio v. Reiner*, 532 U.S. 17, 21, 121 S. Ct. 1252, 1254 (2001) (internal ellipsis, quotation marks, and citations omitted). Without regard to the potential unreliability of inferring guilt from a defendant's Fifth Amendment invocation, the SEC Enforcement Manual provides that "During litigation, the SEC can assert that an adverse inference should be drawn against a defendant who has asserted the Fifth Amendment privilege." (SEC Enf. Man. § 4.1.3).

Although the SEC declined to take investigative testimony from the individual Defendants on the dates that they proposed (before learning of the criminal probe), the SEC after filing this lawsuit on May 13, 2022 demanded expedited depositions of them on May 17 through 20, 2022. (*See* Sherman Decl. at ¶¶ 28-39). In light of the criminal investigation prompted by the SEC, defense counsel informed the SEC that the individual Defendants were willing to be deposed if the SEC requested that the Office obtain use-immunity orders pursuant to 18 U.S.C. § 6003 immunizing them from the use of their deposition testimony in any criminal prosecution. (*See id.*). Such orders would have permitted the individual defendants to give deposition testimony without fear of their statements being used against them in a criminal prosecution, while preserving the Office's ability to prosecute any criminal wrongdoing based on other independent evidence, but the SEC refused Defendants' request. (*See* Sherman Decl. at ¶ 39).

Although "the Fifth Amendment does not forbid adverse inferences against parties to civil actions when they refuse to testify in response to probative evidence offered against them," such "adverse inferences are appropriately admitted . . . only if they are relevant, reliable, and not unduly prejudicial." *Woods* v. *START Treatment & Recovery Ctrs., Inc.*, 864 F.3d 158, 170 (2d Cir. 2017). Importantly, courts have "discretion to refuse to draw such an inference." *Lorusso* v. *Borer*, 260 F. App'x 355, 358 (2d Cir. 2008).

Because drawing adverse inferences here would reward the SEC for ginning up a bogus criminal investigation and leveraging it to corner the individual defendants into "choosing" between risking testimony that could be twisted against them by criminal authorities versus gifting the SEC an unfair advantage, the Court should decline to do so. *See SEC* v. *Caramadre*, 717 F. Supp. 2d 217, 221, 223-24 (D.R.I. 2010) (recognizing that declining to draw adverse inferences and other corrective steps may be appropriate if it turns out that the SEC requested interviews for

the purpose of "pursuing adverse inferences"); *see also Brock* v. *Tolkow*, 109 F.R.D. 116, 120-21 (E.D.N.Y. 1985) (staying discovery pending the outcome of any criminal actions, explaining that although "it does not offend the Constitution if a defendant in a civil case is asked questions the answers to which might incriminate him. . . it certainly undercuts the protections of those provisions, and a Court can exercise its discretion to enable a defendant to avoid this unpalatable choice when to do so would not seriously hamper the public interest").

## CONCLUSION

For the reasons set forth above, the Court should deny the SEC's application for emergency relief in its entirety, and should not draw any adverse inferences against our individual clients based on their respective invocations of their constitutional rights.

Dated:  May 20, 2022
New York, New York

CAHILL GORDON & REINDEL LLP

By:      /s/_____
         Brian Markley
         Samson Enzer
         32 Old Slip
         New York, New York 10005
         Telephone:  (212) 701-3230 / -3125
         Facsimile:  (212) 259-5420

NELSON MULLINS RILEY & SCARBOROUGH LLP

By:      /s/_____
         Scott N. Sherman
         Josh Lewin
         201 17th Street NW
         Atlanta, GA 30363
         Telephone:  (404) 322-6231
         Facsimile:  (404) 322-6338

*Attorneys for Defendants StraightPath Venture Partners LLC, StraightPath Management LLC, Brian K. Martinsen, Francine A. Lanaia, Michael A. Castillero and Eric D. Lachow*